## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANDREA WONG,**

      *Plaintiff,*

  **v.**

**ALICE MARONI,**
**In Her Official Capacity as Director,**
**Pension Benefits Guaranty Corp.,[1]**

      *Defendant.*

Civil Action No. 23-cv-379-MAU

## <u>MEMORANDUM OPINION</u>

Plaintiff Andrea Wong ("Wong") sued the Pension Benefits Guaranty Corporation ("PBGC" or "Agency"), alleging race, sex, and national origin discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Wong claims that the PBGC discriminated against her when it hired a white male candidate instead of Wong for a Deputy General Counsel position. Before the Court is the Agency's Motion for Summary Judgment. ECF No. 19.

Wong has no direct or indirect evidence of discrimination, no evidence that any of the decisionmakers had a history of discrimination, and no evidence sufficient to raise a genuine issue that the Agency did not honestly believe in its decision. The nub of Wong's case is that she should have been promoted because she worked at the PBGC longer than the selectee, worked as an Assistant General Counsel in the department within which she sought to be promoted, and was

---

[1]    The current Defendant has been substituted for her predecessor. *See* Fed. R. Civ. P. 25(d).

more qualified based on her subjective opinions about the job.  Because Wong has failed to raise a genuine issue of material fact warranting a trial, the Court **GRANTS** the Agency's Motion.

<u>**FACTUAL SUMMARY**</u>

**Wong's Background and Qualifications**

The facts material to resolution of PBGC's Motion are not in genuine dispute.  PBGC is a wholly-owned corporation of the United States.  ECF No. 1 ¶ 1; ECF No. 5 ¶ 1.  Wong is an Asian American woman of Chinese descent.  ECF No. 1 ¶ 5; ECF No. 5 ¶ 5.  Wong graduated law school in 1993 and obtained a Master of Laws in Tax in 2001.  ECF Nos. 20-1 at 8:13-14;[2] 23-8 at 4. Since 1997, Wong has worked in the PBGC's Office of General Counsel ("OGC").  ECF No. 19-16 ¶ 1.  A Deputy General Counsel ("Deputy") manages each of the four departments within the OGC.  ECF No. 19-16 ¶¶ 2-3.  Within one of the departments, the Bankruptcy, Litigation, and Terminations Department ("BLTD"), there are three sections of attorneys.  ECF No. 20-1 at 73:2-7.  Each of those sections has six to eight attorneys working under an Assistant General Counsel ("Assistant").  *Id.* at 74:18-24.

From 1997 through 2006, Wong served as a Staff Attorney.  ECF No. 24 ¶¶ 1-2.  In 2006, Wong was promoted to Assistant in the BLTD.  *Id.* ¶ 2.  As an Assistant, Wong supervised six attorneys who represented the PBGC primarily in bankruptcy cases, conducted negotiations, performed transactional work, acted as legal counsel for PBGC's finance transaction department, investigated companies in financial distress, did a small amount of litigation, and advised employees in other PBGC departments on Employee Retirement Income Security Act ("ERISA") and tax issues.  ECF Nos. 20-1 at 10:14-12:4; 16:1-2; 23-8 at 3; 24 ¶¶ 19-22.  Wong's section

---

[2]     Citations to depositions are to the deposition page and line numbers.  All other citations are to the page numbers in the ECF headers or paragraphs of a document where applicable.

generally handled around five to ten active cases.  ECF No. 24 ¶ 20-22.  Wong has not led a team in active litigation in five to eight years.  ECF No. 24 ¶¶ 20-22.

Beyond her role as a supervisor, Wong worked with employees in the Department of Labor and Internal Revenue Service on certain ERISA and tax issues.  ECF No. 23-8 at 3.  Wong occasionally supervised other attorneys outside of her section for certain projects.  ECF No. 19-1 at 16:1-20.  She was also an expert on ERISA Title IV coverage issues and created materials, processes, procedures, trainings, and working groups for handling these coverage issues across BLTD.  ECF Nos. 20-1 at 27:1-28:5; 23-8 at 1-3.  Wong sometimes interacted with PBGC executives to discuss certain cases and occasionally briefed the PBGC's Director, the last briefing having occurred in 2019 or 2020 on whether to continue an opinion letter program that Wong started for Title IV coverage matters.  ECF Nos. 20-1 at 19:1-23:18, 40:9-23.  Wong was also on PBGC's diversity council, spoke at a "couple" of conferences, and participated in the Federal Asian Pacific American Council.  ECF No. 20-1 at 24:19-26:16.

From 2016 to 2020, Wong's supervisor, BLTD Deputy Charles Finke ("Finke"), gave Wong positive employee performance reviews.  ECF Nos. 23-2; 23-3; 23-4; 23-5.  In 2016, Wong served as an acting Chief Deputy Counsel with the Office of Chief Counsel ("OCC") for approximately four months.  ECF No. 23-6.  Wong applied for open Deputy positions in 2016 and 2017, but PBGC's General Counsel at the time did not select her.  ECF No. 20-1 at 42:2-22.

**BLTD Deputy General Counsel Vacancy**

Finke retired as BLTD Deputy in August 2021.  ECF No. 23-11 at 6-7.  PBGC posted a vacancy announcement for his position on August 4, 2021.  ECF No. 19-2.  The Deputy oversees the three sections of attorneys within the BLTD.  ECF No. 20-1 at 73:2-74:5.  The announcement described the responsibilities of the Deputy position:

The Deputy General Counsel for Bankruptcy, Litigation and Terminations has broad discretionary responsibility for the comprehensive development and implementation of the Corporation's legal positions in all Bankruptcy, Litigation and Terminations matters, as well as certain ERISA matters.  Specifically, the Deputy General Counsel for Bankruptcy, Litigation and Terminations:

- As Deputy General Counsel of one of four Departments in the Office of General Counsel (OGC), the incumbent will assist and participates with the General Counsel in the development, planning, management and control of the activities of the Office of General Counsel.  A principal function of the incumbent is to manage the work of the assigned Department through direct supervision of Assistant General Counsels (AGCs) and other Division managers.

- Assist the General Counsel in leading and directing the formulation, development, management, and execution of legal responsibilities related to PBGC's ERISA program.  Assist in the executive overview of legal activities to determine their effectiveness in meeting policy objectives established by the General Counsel and the PBGC Director.

- Coordinate with the General Counsel, and other OGC management staff in the development of OGC's program.  Monitor and review significant cases and projects to help ensure consistency in the application of legal policies and positions, and in the identification of problems.  Recommend changes as appropriate.

- Serve as a leading substantive expert on ERISA matters, Internal Revenue Code (IRC) matters, bankruptcy law and practice, litigation and transactions.  Attend key meetings and conferences on these subjects with other officials, and provide expert legal advice to high-ranking PBGC officials.  Participate in or personally prepare PBGC position papers and official comments on such matters.  Serve as the OGC representative on key committees and task forces within the Corporation and on interagency committees, dealing with significant matters affecting the Corporation and the pension community.

- [The] Department Director[] [sic] has the overall managerial authority for personnel assigned to the Department and administration of the Department's functions and activities.  Exercise immediate supervisory responsibility and give policy guidance and direction to the AGCs, each of whom is responsible for a caseload of representative work in all fields and performed by a corps of attorneys.

ECF No. 19-2.

Wong applied for the position on August 18, 2021.  *See generally* ECF No. 23-8.  Although the announcement was the "main source" of criteria for the position, Wong admitted that the

decisionmaker could consider qualifications that were not specifically listed in the announcement. ECF No. 20-1 at 84:10-20, 86:10-19.  Wong also admitted that, if a decisionmaker believed that certain skills and experiences would assist a person in fulfilling the responsibilities listed in the announcement, the decisionmaker could consider those specific skills and experiences.  *Id*. at 86:10-19.

Wong recognized that the responsibilities of the Deputy were different than those of an Assistant, even in the same department.  ECF No. 20-1 at 84:6-9.  As PBGC's General Counsel Fredrick Russell Dempsey ("Dempsey") testified, an Assistant was more of a supervisor as opposed to a Deputy, who was a manager.  ECF No. 20-2 at 87:2-22.  According to Dempsey, a "supervisor is not a manager, that's a very different role.  A manager must direct the affairs of the entire department and will not be able to know on a per person basis what each person is doing on a daily basis.  So, they must be able to step back and have some form of reporting samples of metrics in order to hold that function as a manager."  *Id.* at 54:7-20.  Wong herself testified that the Deputy would have to use "different management techniques" than an Assistant.  ECF No. 20-1 at 81:2-6.  Specifically, she stated that the Deputy would not be as heavily involved in each case and would have to rely on the Assistants for that information, would be managing the Department overall, "making sure that communications [are] flowing down to staff attorneys as well as up to the general counsel," "reporting up to the general counsel," and coordinating with the other departments.  *Id.* at 81:7-84:1.  Wong also agreed that metrics in reporting were more important for the Deputy position than the Assistant position.  *Id.* at 82:4-7.

### Fessenden's Background and Qualifications

Craig Fessenden is a white man who graduated from law school in 2005.  ECF Nos. 23-9 at 1; 24 ¶ 37.  That same year, the OGC hired Fessenden as a Staff Attorney.  ECF No. 24 ¶ 37.

In 2015, the OGC promoted Fessenden to a flex Assistant within another department. *Id.* ¶ 38. As a flex Assistant, Fessenden supervised attorneys across the office (including nearly every Assistant and seasoned staff attorney) and supervised the OGC's Triage/Intake team. ECF Nos. 19-5 at 21:5-12, 113:22-114:12; 23-9 at 1. Fessenden oversaw all aspects of the bankruptcy, tax, ERISA, and labor law cases he supervised. ECF No. 19-5 at 43:8-44:17,114:13-17. Generally, Fessenden would initiate cases and then "staff [them] up," or other Assistants would "farm out" already-staffed cases to him. *Id.* at 114:21-115:15. Fessenden represented PBGC in federal court, including in bankruptcy courts and before the United States Court of Appeals for the First Circuit. ECF Nos. 19-16 ¶ 41; 24 ¶ 41.

Beyond his role as a supervisor, Fessenden was a specialist within the OGC on private equity and hedge fund issues. ECF Nos. 19-5 at 44:6-12; 23-9 at 1. Fessenden noted in his deposition, however, that the number of times he consulted others on these issues had decreased in recent years. ECF No. 23-14 at 76:9-21. Fessenden also served as the OGC's discovery expert. In that capacity, he developed and assisted attorneys with the OGC's eDiscovery tools, systems, and processes, participated in discovery conferences, and informed attorneys about the OGC's position on privilege, document production, and responses. ECF Nos. 19-5 at 35:11-36:22; 19-16 ¶¶ 50-52; 24 ¶¶ 50-52. Given his technological expertise, Fessenden was the Information System Owner for the OGC's case management system and a member of various technical oversight boards and committees across PBGC, including being on PBGC's Information Technology Program Review Board ("ITRPB"). ECF No. 23-9 at 3. On the ITRPB, Fessenden regularly presented proposals on budgeting and handled procurement issues. *Id.*

During his tenure, the OGC detailed Fessenden to different jobs both inside and outside the Agency. For example, Fessenden served as a Special Assistant United States Attorney for the

United States Attorney's Office for the District of Columbia for seven months. ECF No. 23-9 at 1. After that, Fessenden worked as special assistant to the Chief Counsel in OCC. *Id.* at 3; *see also* ECF No. 19-5 at 83:9-84:22. In that role, Fessenden worked on projects and high profile cases for the Chief Counsel and regularly met with executives of other PBGC departments, including OGC management. ECF Nos. 19-5 at 83:9-84:22; 23-9 at 3. Fessenden also spent nine months as a BLTD Assistant and managed one of the divisions from 2016 to 2017. ECF Nos. 19-5 at 24:1-24:8; 19-15 at 40:5-11. Finke supervised Fessenden during that time and gave Fessenden a positive employee performance review. ECF No. 19-5 at 92:10-93:6. Finke testified that Fessenden did well but noted that he did not have "as good a handle on the [BLTD] program generally as" Wong at that time and that had a "learning curve" because Fessenden was new at managing people at the time. ECF Nos. 19-15 at 89:22-90:2; 23-13 at 50:18-51:14.

### Interviews and Result

As the hiring official, Dempsey organized the selection process for the vacant Deputy position and set two rounds of interviews. ECF No. 24 ¶ 53. In the first round, an initial screening panel interviewed all candidates and recommended only the most qualified for the second round. *Id.* Six attorneys applied for the position. *Id.* Of those six, the screening panel recommended Wong, Fessenden, and Lori Butler for the next round. ECF Nos. 19-4 at 92:5-6; 24 ¶ 54. Dempsey also asked Finke for his opinion of the six candidates. ECF No. 23-13 at 38:13-42:11. Finke told Dempsey that Wong and Butler, both BLTD Assistants, were "far and away better qualified" than the other candidates. *Id.* at 42:3-6.

The second-round interview panel consisted of Dempsey, Patricia Kelly, the Agency's Chief Financial Officer, and Karen Morris, then-Chief of the Office of Negotiations and Restructuring. ECF Nos. 19-16 ¶ 54; 24 ¶ 54. All three panelists are white. ECF No. 19-1 at

96:11-21.  After interviewing the three finalists, the panel unanimously ranked Fessenden as the top choice.  ECF Nos. 19-12; 24 ¶ 55, 84.  Accordingly, Dempsey selected Fessenden for the Deputy position.

## PROCEDURAL HISTORY

Wong initially contacted an Equal Employment Opportunity Commission ("EEOC") counselor on November 9, 2021.  ECF No. 23-12 at 3.  Following unsuccessful mediation, Wong filed a formal complaint with the EEOC on February 15, 2022.  *Id.*  On May 31, 2022, Wong requested a hearing before an administrative law judge but ultimately withdrew that request.  ECF No. 23-10 at 3.

On February 9, 2023, Wong filed her Complaint and alleged that PBGC discriminated against her based on her sex, race, and national origin by not selecting her for the Deputy General Counsel position.  ECF No. 1.  The Parties completed discovery on April 30, 2024.  Minute Order (Feb. 23, 2024).  PBGC filed this Motion on September 24, 2024.  ECF No. 19.  This Motion is ripe for review.  ECF Nos. 19; 23; 25.

## ANALYSIS

### I.    Standard of Review

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The mere existence of some factual dispute is insufficient on its own to bar summary judgment.  *Anderson*, 477 U.S. at 247-48.  The dispute must pertain to a

"material" fact. *Id*. Accordingly, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248 (citation modified). The court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

On summary judgment, a reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See, e.g.*, *Stoe v. Barr*, 960 F.3d 627, 629 (D.C. Cir. 2020). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott*, 550 U.S. at 380 (citation modified). Instead, the non-movant must point to specific facts in the record that reflect a genuine issue warranting trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In doing so, the non-movant must cite competent, admissible evidence and may not rely on "statements that are impermissible hearsay or that are not based on personal knowledge." *Shuler v. District of Columbia*, 744 F. Supp. 2d 320, 327 (D.D.C. 2010) (citation modified). Conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## II.    Title VII of the Civil Rights Act of 1964

Title VII of the Civil Rights Act prohibits an employer from discriminating against its employees and applicants based on race, sex, or national origin, among other characteristics. 42 U.S.C. § 2000e-2(a); *see also Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019); *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). For claims of intentional discrimination, "[p]roof of illicit motive is essential," and the employee "at all times" maintains

the burden to prove "that the defendant intentionally discriminated against" him.  *Figueroa*, 923 F.3d at 1086 (quoting *Segar v. Smith*, 738 F.2d 1249, 1265, 1267 (D.C. Cir. 1984)).  Under the statute, "national origin" is construed as "the country where a person was born, or, more broadly, the country from which his or her ancestors came."  *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973).

Where there is only circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework governs the analysis.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *see also Figueroa*, 923 F.3d at 1086 (citing *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)).  Under this framework, the plaintiff "must first make out a prima facie case" of discrimination.  *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019).  To do so, the plaintiff must show that: (1) "she is part of a protected class under Title VII"; (2) "she suffered a cognizable adverse employment action"; and (3) "the action gives rise to an inference of discrimination."  *Wheeler*, 812 F.3d at 1113-14.  The burden next shifts to the employer to "come forward with a legitimate reason for the challenged action."  *Iyoha*, 927 F.3d at 566.  Finally, if the employer carries its burden of production, the "burden then shifts back" to the employee, who must prove that, despite the employer's proffered reason, she has been the victim of intentional discrimination.  *Wheeler*, 812 F.3d at 1114.

"When the employer properly presents a legitimate, nondiscriminatory reason, the District Court 'need not—*and should not*—decide whether the plaintiff actually made out a prima facie case.'"  *Figueroa*, 923 F.3d at 1087 (quoting *Brady*, 520 F.3d at 494).  Instead, the Court should focus on one central question: whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ."  *Brady*, 520

F.3d at 494.  To do so, the plaintiff must demonstrate that a "reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason."  *Walker v. Johnson*, 798 F.3d 1085, 1096 (D.C. Cir. 2015).  Further, "courts are without authority to second-guess an employer's personnel decision absent demonstrably discriminatory motive."  *Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)) (citation modified).  Accordingly, "once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers."  *Fischbach*, 86 F.3d at 1183 (citation modified).

### III.    PBGC's Offers a Legitimate, Nondiscriminatory Reason for Selecting Fessenden.

Under the second prong of the *McDonnell Douglas* test, an employer must provide a legitimate, nondiscriminatory reason for its decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802. An employer satisfies that burden when: (1) it "produce[s] evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) the factfinder is "reasonably . . . able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) the "nondiscriminatory explanation [is] . . . facially credible in light of the proffered evidence"; and (4) the evidence presents a "clear and reasonably specific explanation," such that the employee has "a full and fair opportunity to attack the explanation as pretextual."  *Figueroa*, 923 F.3d at 1087-88 (citation modified).  PBGC easily satisfies this burden.

PBGC has offered a number of clear, reasonably specific, and nondiscriminatory reasons for choosing Fessenden for the Deputy position instead of Wong.  *See Figueroa*, 923 F.3d at 1088 (employer's reason must be a "clear and reasonably specific explanation") (quoting *Segar*, 738

F.2d at 1269 n.13).  PBGC does not dispute that Wong is a "well-respected lawyer who was qualified for the Deputy position . . . ."  ECF No. 19 at 6.  As PBGC points out, however, the decisionmakers unanimously agreed that, among other things, Fessenden's "broader scope of skills, experience in reporting up and managing larger projects, and inter- and intra-agency relationships that he formed" made him the *most* qualified candidate.  *Id.*

The PBGC cites ample documentary and testimonial evidence to support its selection. There is no dispute that all three panelists unanimously chose Fessenden over Wong as the strongest candidate.   Among other things, the Agency highlights Fessenden's breadth of experience, his technological knowledge, and his relationships with employees and executives across PBGC.  *See* ECF No. 19 at 26-30 (citing extensive record evidence).  This included Fessenden's experience as a flex Assistant, which is experience that Wong did not have.  ECF No. 19 at 26.   As a flex Assistant, Fessenden obtained a wide range of legal and management experience litigating high-profile bankruptcy and ERISA cases.  ECF No. 19-6.  He had argued cases in federal court, including before the U.S. Court of Appeals for the First Circuit, and many federal bankruptcy courts.  ECF No. 19-5 at 29:19-35:10. Because of his participation in high-stakes litigation and projects, Fessenden had experience routinely "report[ing] up" to the Director, General Counsel, the Board, and the Executive Committee.  ECF No. 19-6.  Fessenden also served as a special assistant to the Chief Counsel where he "participated in regular meetings with virtually every department [the Office of General Counsel] interacted with" and developed "close and positive relationships with them."  *Id.*  Moreover, he "completed projects for the former General Counsel to determine how effective teams were in meeting client departments' needs, and he suggested reform."  ECF No. 19-5 at 83:6-84:22.

Dempsey testified that Fessenden's leadership on eDiscovery and the case management system initiatives gave him experience with technology and "working across the PBGC." ECF No. 19-4 at 96:18-97:13. Dempsey also stated that Fessenden was the most qualified to be Deputy because of Fessenden's skills in metrics and reporting, as the Deputy directs "the affairs of the entire department." *Id.* at 54:7-20. Accordingly, the Deputy would "not be able to know on a per person basis what each person is doing" and instead needed to "have some form of reporting samples of metrics in order to hold that function as manager." *Id.* Morris echoed Dempsey's evaluation. ECF No. 19-14 ¶ 45.

The panelists determined that Wong's experiences and skill set were more limited in scope. Specifically, the panelists agreed that Wong did not have a similar breadth of experiences or exposure to leadership as compared to Fessenden. ECF Nos. 20-3 at 59:8-61:13; 19-14 at ¶ 45. Morris stated that the General Counsel, the PBGC Director, PBGC's Board of Directors, and Congress increasingly expected metrics and reports on the OGC's work, so it was important for a Deputy to have skills in metrics and reporting. ECF No. 20-3 at 38:16-40:2. Morris further noted that Fessenden had been "reporting up" to PBGC executives for a long time and that she had witnessed Fessenden brief the Chief Counsel on one of PBGC's biggest cases. ECF Nos. 19-11 at 45:12-46:22; 19-14 at ¶ 45.

The panelists also agreed that Fessenden performed much better during the final interview than Wong. Dempsey testified that Fessenden displayed strong problem-solving and strategic-thinking skills, had "savviness on highly sensitive issues" impacting PBGC, and showed he could handle himself when interacting with executives and the PBGC Director. ECF No. 19-4 at 95:20-96:17. Dempsey's interview notes corroborated his assessment: Fessenden was "most strategic, good on his feet, clearest answers to questions, most persuasive, effective with getting to core

issue, politically savvy, most creative." ECF No. 19-12.  The notes about Wong's interview stated in part that, although she had "management experience," "[q]uestions can have a delay in getting to an answer.  Said need to be less siloed in OGC but didn't say how."  *Id.*; *see also* ECF Nos. 19-9; 19-10.  The other second-round panelists also testified that Fessenden performed the best in the interview.  *See* ECF No. 19-12 (recapping that all panelists ranked Fessenden first); *see also* ECF Nos. 19-8 at 29:16-30:22; 20-3 at 59:4-61:6.

On certain specific issues, it was clear that Fessenden had thought more extensively about his vision for the position.  For example, when the panel asked Wong about metrics and reporting, she was unable to provide any specific solutions because she was unable to determine what the panelists' "specific concerns" were.  ECF No. 20-1 at 77:23-78:25.  On the other hand, Fessenden pointed out weaknesses in the existing system and "discussed the need for better reporting using not only the current system, but also by leveraging the new case management system with better metrics and reporting so that the Office of General Counsel could explain the importance of its work to the other departments."  ECF No. 19 at 15 (citing Fessenden Dep. at 92:16-94:1).  As Dempsey's contemporaneous notes reflect, Wong said she would "continue with existing reports and meetings," whereas Fessenden discussed weaknesses with current reports and offered new ideas to improve the system.  ECF Nos. 19-9; 19-7 at 4.

Dempsey testified that, after the interviews, he felt that Fessenden was a more strategic thinker and had a specific vision for how he would lead the Department.  ECF No. 19-7 at 32, 45.  Dempsey also stated that Fessenden provided the clearest responses to questions and demonstrated that he had considered sensitive issues that he might encounter as a Deputy.  *Id.*  Morris felt that Fessenden had focused on the future of the OGC and its role within the Agency.  ECF No. 20-3 at 59:8-18.  Fessenden spoke in a "forward-looking manner," whereas Wong "spoke knowledgeably"

about handling cases and supervising lawyers, but "not with the breadth" of Fessenden.  *Id.* at 59:8-60:20.  Morris stated that Fessenden had knowledge in areas outside of legal issues, including budgeting, technology and procurement.  ECF No. 20-3 at 59:8-18.  Wong, however, demonstrated a "somewhat narrower reflection" in terms of her experience and expertise.  ECF No. 20-3 at 60:21-61:6.

In sum, although the decisionmakers considered both candidates to be qualified and experts on the substantive law, Fessenden was the best candidate due to his breadth of exposure to leadership across the Agency, his high-level thinking in answering questions, and his ability to take ownership of issues and resolve problems.  Although there appears to be no dispute that Wong met minimum standards to do the job, the panelists considered Fessenden to have more creative and strategic thinking that would be required of a manager in a position such as the Deputy. Moreover, one of the panelists stated that Fessenden had specific experience in one of the Agency's major initiatives, which was to modernize its information technology capabilities.  ECF No. 19 at 29-30 (and record evidence cited therein).  Wong, on the other hand, was not as well prepared for questions about modernizing the agency and improving reporting.  *Id.*

There is no dispute that the Agency's stated justifications for Wong's non-selection are clear, facially credible, and supported by admissible evidence.  *Figueroa*, 923 F.3d at 1087-88.

**IV.    Wong has Failed to Offer Sufficient Evidence for a Reasonable Juror to Conclude that the Proffered Reason for Her Non-Selection was Both Pretextual and Discriminatory.**

At the third step of the *McDonnell Douglas* test, Wong's burden is to identify a genuine issue of material fact that the PBGC's stated reason for her non-selection was mere pretext *and* that the actual reason was discrimination based on Wong's race, sex and/or national origin. *McDonnell Douglas Corp.*, 411 U.S. at 804; *Morris v. McCarthy*, 825 F.3d at 658, 671-72 (D.C.

Cir. 2016). Even drawing all justifiable inferences in her favor, Wong has failed to demonstrate that "a reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason." *See Walker*, 798 F.3d at 1096.

Wong has no direct or indirect evidence of discrimination. She has not offered any evidence that the panel members made discriminatory statements, exhibited discriminatory attitudes, or had a history of discrimination. Wong testified that she was not aware of any such evidence on the part of the three panelists Dempsey, Morris, and Kelly. ECF No. 20-1 at 132:15-133:18. In fact, it is undisputed that the only other person Dempsey hired during his time as General Counsel was an African American female. ECF No. 20-2 at 86:12-87:1.

Instead, Wong's principal argument turns on inferences she claims the Court should draw from the evidence based on her own opinions about the job. Specifically, Wong argues that, compared to Fessenden, she was significantly better qualified for the BLTD Deputy position, which in and of itself should raise an inference of discrimination sufficient to warrant a jury trial. *See generally* ECF No. 23. Wong also argues that the Court could draw an inference of discrimination in light of Finke's favorable view of Wong. *Id.* at 22-27. PBGC responds that Wong's arguments are based solely on her own opinions of the relevant job requirements and that there is an insufficient gap between Wong and Fessenden's managerial and substantive experience to warrant a *per se* inference. ECF Nos. 19 at 30-35; 25 at 2-12. PBGC also argues that Wong has failed to raise any evidence to dispute that the panelists honestly believed in their decision. ECF No. 19 at 35.

### A. There is No "Wide and Inexplicable Gulf" in Qualifications Sufficient to Raise an Inference of Discrimination.

To infer pretext, the qualifications gap between a plaintiff and the selectee must be "great enough to be *inherently indicative* of discrimination." *Holcomb v. Powell*, 433 F.3d 889, 897

(D.C. Cir. 2006) (emphasis added); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) ("If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job . . . the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate . . . ."); *Lathram v. Snow*, 336 F.3d 1086, 1091 (D.C. Cir. 2003) (holding that jury "could infer discrimination" from a "wide and inexplicable gulf between the qualifications" of the plaintiff and the selectee). A court may look to the totality of the decision-making process, but absent evidence of animus, a court cannot second guess how an employer weighed the various qualifications of candidates. *See Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007).

Wong argues that she was significantly better qualified for the position than Fessenden, thereby raising an inference of discrimination as a matter of law. ECF No. 23 at 18-22. The record does not support this conclusion. With respect their substantive knowledge, Both Wong and Fessenden are long-time employees who have worked at PBGC for more than fifteen years. *See* ECF No. 24 ¶¶ 1, 37. Although Wong has eight more years' experience at PBGC, she testified that she had only "a bit more experience," "[i]f not the same," as Fessenden in leading attorneys in complex litigation. ECF No. 20-1 at 60:2-23. Both Wong and Fessenden testified to their subject matter expertise in ERISA, tax, and bankruptcy, as well as certain subsets of those areas. *See* ECF Nos. 20-1 at 27:2-28:5 (explaining expertise in Title VI coverage); 19-5 at 44:6-12 (explaining expertise in private equity and hedge funds). Further, Fessenden's experience involved some appellate work and working on cases that PBGC executives considered notable. *See* ECF No. 19-5 at 113:22-116:8 (Fessenden deposition testimony concerning his casework, including his work on the "biggest litigation [the PBGC's] ever had" that went on for over a decade); ECF Nos. 19-14 at 6 (Morris EEO affidavit noting Fessenden's "experiences on reporting

17

up have been on mostly large bankruptcy cases that have the attention of the Director"); 23-13 at

8 (Finke deposition testimony noting that flex Assistants generally had larger cases or overflow

cases from other divisions).  Viewing the evidence in the light most favorable to Wong, it is

undisputed that she had served in a leadership position within the BLTD, whereas Fessenden had

not.  When viewing all the experiences and qualifications of the two candidates, however, it is

clear that Fessenden had relevant experience that Wong did not.  Thus, the gap between Wong and

Fessenden's qualifications in terms of substantive experience is at most slim, which is insufficient

to survive summary judgment when considering the other relevant qualifications for the position.

*See Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006).

A comparison of Wong and Fessenden's managerial experience fares no better.  Wong has

supervised her team of attorneys as a division Assistant in BLTD for fifteen years, with a detail as

an acting Chief Deputy Counsel in the OCC for approximately four months in 2016.  ECF Nos.

23-6; 24 ¶ 2.  Fessenden supervised attorneys on specific cases as a flex Assistant for six years

with details to the Office of the United States Attorney and other parts of PBGC, including serving

as a division Assistant in BLTD from 2016 to 2017 and as a special assistant to the Chief Counsel

in the OCC.  ECF Nos. 19-5 at 24:1-8; 23-9 at 1-3; 24 ¶ 38.  Dempsey stated that he placed more

significance in Fessenden's flex Assistant experience leading other team members that did not

directly report to him as compared to the experience of primarily being a division Assistant

supervising one team of attorneys within BLTD.  Specifically, Dempsey repeatedly stressed that

he believed that supervising and managing were different skills because a manager had broader

obligations to oversee an entire department compared to a supervisor who only oversaw a certain

number of individuals.  ECF No. 19-4 at 54:7-20, 87:2-18; 98:3-99:4.

Wong disagrees with Dempsey's management assessment and claims that the only appropriate comparison would be between her and Fessenden's relative experiences as division Assistants within the BLTD.  *See* ECF No. 23 at 21-22.  As PBGC admits throughout its brief, there is no dispute that the panelists believed Wong to be an excellent lawyer who had done a good job as an Assistant within the BLTD.  The panelists, however, valued Fessenden's broader range of experience and specific exposure within the Agency.  Absent evidence of discriminatory animus, of which there is none, the Court cannot tell an employer "what type of experience it should have valued in conducting its hiring process." *Elliott v. Acosta*, 291 F. Supp. 3d 50, 63 (D.D.C. 2018).

In addition, Wong's subjective opinions about the best qualifications for the position are irrelevant.  *See Dyer v. McCormick & Schmick's Seafood Rests, Inc.*, 264 F. Supp. 3d 208, 229 (D.D.C. 2017) (noting that portions of the plaintiff's deposition in which he provided his own subjective assessment of his credentials were "largely irrelevant for purposes of establishing discriminatory motive") (citation modified).  Instead, it is the decisionmaker's perception that is relevant.  *Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014); *see also Fischbach*, 86 F.3d at 1183 (stating that the question at step three does not concern "the correctness or desirability of the reasons offered" by the employer, only whether the employer "honestly believes in the reasons it offers" (citation modified)).  Accordingly, Wong and Fessenden's qualifications present a close call at best and, without more, fail to yield an inference of discrimination.  *See Barnette*, 453 F.3d at 518 (holding that "close call[s]" between candidates "fail[] to move [a] case beyond summary judgment") (citation modified).

### B. Finke's Positive Assessment of Wong Does Not Raise an Inference of Discrimination.

Wong also relies heavily on Finke's assessment that she was "plainly superior" to Fessenden.  *See* ECF No. 23 at 22-23.  As noted above, Finke had given Wong positive performance assessments and testified that he believed Wong to be a superior candidate to Fessenden.  For a number of reasons, Finke's view of Wong's qualifications relative to those of Fessenden does not raise an inference of discrimination sufficient to warrant a trial.

First, it is undisputed that Finke was not one of the interview panelists.  Moreover, although Finke spoke to Dempsey, Finke was not present at Wong or Fessenden's interviews and did not review their applications.  ECF No. 19-15 at 27:19-28:7, 133:22-135:4.  It is also undisputed that Finke was not the selecting official and, accordingly, would not necessarily be aware of Dempsey's priorities in filling the position.  *Id.* at 135:3-4.  Finke's evaluations of Fessenden and Wong stem from Finke's experiences supervising them as Assistants within the BLTD, but his experience with Fessenden was narrower than his experience supervising Wong.  *Id.* at 40:2-11.  For the time that Finke *had* spent supervising Fessenden, however, Finke testified that Fessenden did "well" and that Finke had given Fessenden the highest rating possible on his performance appraisal.  *Id.* at 89:17-93:6.  In fact, Finke testified that he disagreed with Wong that Fessenden did not do well as an Assistant within BLTD.  *Id.*

Accordingly, although Wong attempts to characterize Finke's testimony as finding Fessenden less qualified based on a thorough and equal understanding of both candidates' qualifications and performance, it is clear that Finke did not know Fessenden as well and, as such, did not have the proper foundation to make such an assessment.  Even assuming Finke *did* have that foundation, it is not Finke's opinion that matters in this analysis.  The question is whether the panelists honestly believed in their reasons for selecting Fessenden.  *See Fischbach*, 86 F.3d at 1183.

**C. There is No Evidence to Suggest that the Panelists Did not Honestly Believe in their Reasons for Hiring Fessenden.**

To that end, Wong fails to point to any evidence which raises a genuine issue that the panelists did not honestly believe in the reasons they offered for selecting Fessenden. ECF No. 25 at 2-3. The Agency has put forth evidence that the panelists unanimously chose Fessenden based on his application and interview. The Agency further points to testimony or documentary evidence for each panelist in which the panelist articulated the specific reasons he or she had for choosing Fessenden over Wong. Wong does not point to any record evidence undermining the panelists' honest belief in the reasons they gave, let alone evidence sufficient to raise a genuine issue about the panelists' honest belief. At most, Wong relies principally on her own subjective opinions about what *she* believes would have made a good Deputy.

As the Agency correctly observes, Wong fails to appreciate that "the selection panel unanimously valued Mr. Fessenden's broader experience as a flex Assistant General Counsel, reporting up and managing larger projects, and forming inter- and intra-agency relationships— with attorneys or otherwise—as opposed to Plaintiff's supervision of very small groups of attorneys as a section Assistant General Counsel." ECF No. 25 at 3. Of course, the Court's place is not to second guess the wisdom or correctness of the PBGC's decision, only to assess whether there is any genuine dispute as to whether the PBGC honestly believed in that decision. This is the seminal question. *See Fischbach*, 86 F.3d at 1183. Because Wong has failed to raise a genuine dispute as to whether the Agency honestly believed in its decision, a trial is not warranted in this case.

**D. Wong's Complaint Regarding the Qualifications of Metrics and Reporting Does not Raise an Issue of Pretext and Discrimination.**

Finally, Wong argues that Dempsey's reliance on metrics and reporting as criteria for filling the Deputy position was pretextual. *Id.* at 23-25. In making this argument, Wong primarily relies on the vacancy announcement for the Deputy position, as the announcement did not explicitly list metrics and reporting skills as one of the responsibilities for the position. *Id.* Wong asserts that Dempsey did not mention metrics and reporting being essential to the Deputy position until Wong filed her EEO complaint. *Id.* at 23. PBGC contends that the vacancy announcement's listed responsibilities reasonably encompass metrics and reporting and that Dempsey brought up these skills before Wong's EEO activity. ECF Nos. 19 at 35-37; 25 at 12-14.

"[R]easonable employers 'do not ordinarily limit their evaluation of applicants to a mechanistic checkoff of qualifications required by the written job description.'" *Gold v. Gensler*, 840 F. Supp. 2d 58, 68 (D.D.C. 2012) (quoting *Jackson*, 496 F.3d at 709). When a selecting official makes the ultimate hiring decision based "on one or more specific factors encompassed within a broader and more general job description," that decision "does not [] raise an inference of discrimination sufficient to overcome summary judgment." *Jackson*, 496 F.3d at 709. Wong does not meaningfully respond to PBGC's argument that the job description fairly encompasses metrics and reporting within the vacancy announcement's listed qualifications. As PBGC points out, the announcement's stated responsibilities of the Deputy include working with the General Counsel "in the development, planning, management, and control" of OGC activities, assisting in the "executive overview of legal activities to determine their effectiveness in meeting policy objectives," and being a manager and administrator for BLTD. ECF No. 19 at 36. Indeed, Dempsey testified at length in his deposition as to how a Deputy's skills in metrics and reporting were part of fulfilling these duties, including in managing the entire BLTD and monitoring and reviewing cases and projects. *See* ECF No. 19-4 at 53:11-13, 54:11-20, 71:18-72:2, 100:8-16. The

Deputy's responsibilities as listed in the vacancy announcement reasonably encompass skills in metrics and reporting.

Wong's assertion that Dempsey did not bring up the relevance of metrics and reporting until her EEO complaint is also inconsistent with the record. Wong testified in her deposition that Dempsey might have mentioned metrics and reporting in a supervisor meeting before her interview. ECF No. 20-1 at 77:5-77:15. Wong also testified that Dempsey asked her a question about metrics and reporting in her interview for the Deputy position. *Id.* at 77:16-78:14. Although Wong takes issue with how Dempsey interpreted her answer to that question, the record does not support that Dempsey's reliance on metrics and reporting is an impermissible after-the-fact excuse for choosing Fessenden. *See id.* at 77:25-78:14.[3] And it certainly does not raise a genuine issue of material fact that the PBGC's selection of Fessenden was pretext for unlawful discrimination.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** PBGC's motion for summary judgment. ECF No. 19. The Court will issue a separate Order.

Date:    September 30, 2025

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

---

[3]    Wong also takes issue with Dempsey's reliance on metrics and reporting because the OGC has other divisions and positions focused on those skills and technology assistance. ECF No. 23 at 24-25. As noted above, the Court will not second-guess which qualities an employer weighs more heavily in filling a position because an employer is free to consider "strategic priorities and goals at the time, the strengths and weaknesses of the applicant pool, and the overall skills of and gaps in their existing workforce, among many other factors." *Jackson*, 496 F.3d at 708.